E. W. & P. N. Browne, of Shreveport, for appellant.

Irion & Switzer and Chas. B. Emery, all of Shreveport, for appellee.

DREW, Judge.

This is a suit to collect damages by reason of an alleged violation of a contract for advertising space on the west wall of a brick store building leased and occupied by plaintiff, and which is located at 512–14 Crockett street, Shreveport, La. The wall in question faces a large vacant lot which is now owned by two different persons and leased to A. Wyatt Jones for a filling station and parking lot. The contract which is alleged to have been violated is dated November 6, 1931, and is as follows:

"With reference to the bulletin boards now on the side wall of your store 512 Crockett Street of this city, it will be agreeable with us to settle the matter in accordance with the following conditions:

"We are to be granted the full privilege of the use of this entire west wall of the building at the above location for bill board or poster board advertising, except tire and auto accessories; we will allow you to use the first bulletin, now existing, and agree to service same for you with two painted copies per year; agree to pay you cash $100.00 for the two painted bulletins on the wall referred to; all of the advertising structures which we may

## AUTO–LEC STORES, Inc., v. B. & B. SYSTEM, Inc.*
### No. 5091.

Court of Appeal of Louisiana.
Second Circuit.
June 29, 1935.

---

place on this wall, in addition to the one you are to use, are to remain the property of the B. & B. System, Inc.

"It is further understood and agreed upon that should any of this advertising structure referred to become obstructed or cause to be removed within one year from date for any reason whatsoever beyond our control, you are to reimburse B. & B. System, Inc., for the full amount of the $100.00 referred to.

"It is further understood and agreed upon that this agreement foregoes any previous written or verbal statement relative to the matter in question and it is understood and agreed upon that this agreement is to continue in force as long as you have the said building leased or until such time as the said wall should become useless for our purposes and can only be cancelled by mutual consent of both parties thereto.

　"[Signed]　B&B System, Inc.,
　　　　　　"By Geo. B. Clement
　"Accepted
　　　　　"Auto-Lec Stores, Inc.,
　　　　　　"By P. Stern, Pres."

Plaintiff, after setting out the contract in its petition, alleged that defendant, through its representative, in an effort to avoid the terms of its contract with petitioner, went to the said Jones and solicited from him a letter wherein the said Jones should state that the B. & B. System, Inc., would not be permitted to go upon said property for the purpose of servicing the sign, as it was required to do under the contract entered into by and between the B. & B. System, Inc., and petitioner; and that the said Jones would not have done so had it not been for said action on the part of defendant to avoid its own contract with plaintiff. It further alleged that, immediately after defendant obtained the said letter from Jones, it proceeded upon said property and erected board signs in front of plaintiff's wall which displaced plaintiff's advertisement, and that the said advertisement of which plaintiff was deprived was worth $35 per month to it, and accordingly it was entitled to damages for said amount, due to the existence of the lease and the renewal thereof under an optional agreement.

To plaintiff's demands defendant admitted the contract. It admitted that it did contract for signboards on the vacant lot about September 14, 1933, and that said signboards hid from view the advertising of plaintiff on the wall. It admitted that A. Wyatt Jones wrote a letter confirming a prior statement made to defendant's agent, but it denied all of the other allegations, and especially those as to any fraudulent acts or motive on its part. Defendant further alleged that it was never authorized by any one in authority to go on the vacant lot and service the said signboards, but, on the contrary, it had from the very beginning been threatened by an injunction suit for trespassing; that it then consulted counsel, and, on advice of counsel, refrained from further entering upon said property. It further alleged that, after said injunction suit was filed, it did not construct any additional signboards on said wall, but actually removed one or two boards for which it had paid $100, leaving the one board carrying the advertising of plaintiff, that it made no further effort to avail itself of the advantages given under said contract, and that the contract was rendered null and void and without consideration, as plaintiff at no time was able to give to defendant free access to said wall which was necessary for servicing, maintaining, and painting same.

It further alleged that the said wall projects from two to four inches over on the ground of the adjoining lot owner, and that plaintiff at no time had any control over same, and therefore could not give such control over same to defendant so that it could comply with its contract.

It further alleged that it was entitled to the reimbursement of $100 it had paid plaintiff for the two signboards on said wall; and, in reconvention, prayed for judgment for said amount.

On these issues the case went to trial below. The lower court rendered judgment in favor of plaintiff at the rate of $25 per month from September 14, 1933, the date of the alleged breach of contract, until August 31, 1934, the date of the expiration of the original lease on the building held by plaintiff. It further reserved to plaintiff the right to sue for damages accruing since the last-named date, provided it continued to lease the said building.

From this judgment defendant appealed to this court, and plaintiff has answered the appeal, praying that the amount of the said judgment be increased from $25 to $35 per month, and that the time which same shall run should not be limited to the expiration of the original lease, but

that the judgment read for such period of time as plaintiff remains in said building as lessee.

The learned judge of the lower court, in a well-reasoned written opinion, has correctly analyzed the evidence in the case and correctly found the facts and applied the law applicable thereto. That opinion is as follows:

"In August, 1931, plaintiff entered into a contract of lease with the owners of 512 Crockett Street, the lease expiring in August, 1934, but with option of renewal for two more years. The building was a one-story affair, and the contract granted certain advertising privileges on the outside wall facing McNeil Street. The property between the building and McNeil Street was vacant property, with nothing to obstruct the view of the wall. In this building plaintiff conducted an auto supply store.

■ "On November 6, 1931, plaintiff entered into a contract with defendant under the terms of which the entire west wall was let to defendant for advertising purposes, with the understanding that the first bulletin (space) was to be used to advertise plaintiff's business, defendant agreeing to service same with two painted copies per year. The contract between the parties contained the following clause:

" 'It is further understood and agreed * * * that this agreement is to continue in force as long as you have the said building leased or until such time as the said wall should become useless for our purposes and can only be cancelled by mutual consent of both parties hereto.'

"At that time the adjoining vacant property belonged to W. H. Booth. On November 14, 1931, defendant received a letter from Tucker & Mason, in their capacity as attorneys for W. H. Booth, stating that on November 6, 1931, they had written to plaintiff asking it to remove the sign board, and had been told by plaintiff that the board belonged to defendant. The letter to defendant notified defendant to remove the board within five days. On the same day defendant wrote plaintiff informing it of the contents of the same, and likewise on the same day wrote Tucker & Mason. Hearing nothing from plaintiff until November 23rd, defendant wired it, and duly received a reply dated November 24th, instructing it not to remove the boards. On November 30th, Tucker &

Mason again wrote defendant stating that it was the intention of Mr. Booth to seek the legal removal of said boards, and defendant was warned not to go upon Mr. Booth's property for the purpose of servicing said signs.

"Defendant attempted to carry out its contract with plaintiff by painting a sign on the board for plaintiff, but had used no more of the space when both plaintiff and defendant were met with an injunction instituted by Mr. Booth. On December 23, 1931, the return date of the rule, the matter was continued by agreement of counsel and on February 11, 1932, the case was dismissed by counsel for plaintiff as of non-suit.

"At this time only one sign (that of plaintiff) had been painted and lighted. Defendant made no further use of the wall; did not repaint the sign for plaintiff, but permitted the lights to burn for a period of almost two years.

"In the latter part of August, 1933, plaintiff notified defendant that it wanted its sign repainted. Defendant blotted out the old sign, but did not repaint a new sign. Instead of doing so, defendant sent its Mr. Anderson to see Mr. A. W. Jones (who had recently secured a lease on the vacant property) to see what his attitude would be as to servicing the boards. On September 18, 1933, Mr. Jones signed a letter addressed to defendant (but which had been written by defendant) stating:

" 'This will confirm my conversation of Monday September 11th, with your Mr. Anderson, in which I demanded that the B&B System refrain from servicing bulletin board on wall adjoining my parking lot.' "

On September 14, 1933, defendant addressed a letter to plaintiff which we copy in full; as it contains the sole contention defendant was making at that time, and a contention which it seems to us is inconsistent with the contention now made that the contract was ended by the suit of Mr. Booth. The letter reads:

" 'Kindly refer to our letter to you of November 6, 1931, signed by our Mr. Geo. B. Clement, and accepted for the Auto-Lec Stores by Mr. P. Stern, President.

" 'By its terms, this contract is now cancelled.

" 'In the last paragraph, the contract reads,— " * * * this agreement is to

continue in force * * * until such time as said wall should become useless for our purposes. * * *"

" 'Kindly be advised that such is now the case. The lot adjoining the Auto-Lec building has been leased by a certain party, and this party has instructed us to keep off the lot. Hence, we are unable to service the present Auto-Lec sign.

" 'Furthermore, the lessee of this lot has informed us that whenever he sees fit, he is going to place signs on this property along the wall. This, as you can readily see, nullifies any possible value in the brick wall to us and the wall "becomes useless for our purposes."

" 'Of course, as long as the adjoining lot remained in the hands of a person who was unconcerned with the development of the lot, and therefore unconcerned as to how the brick Auto-Lec wall was used, the arrangement between the Auto-Lec Stores and the B&B System could be carried on indefinitely. But such is not now the case. The man who controls the lot controls 100% of the air above the lot, and can place anything on this ground that he sees fit. We have had too much experience in such matters to question his right to do as he pleased in the matter.'

"Shortly following this letter, under a contract between defendant and Mr. Jones, the defendant erected a sign board along the wall in question which entirely obscures same.

"In the testimony of Mr. McFaddin, president of defendant, he states that he agreed with Mr. Booth that nothing further would be done under the contract with plaintiff, and that it was for that reason, the Booth suit was dismissed, and he considered the contract at an end. But it is significant that Mr. Booth sold his property on February 10, 1932, (and so had no further interest in the suit) and the suit was dismissed on February 11, 1932. It is true that defendant made no use of the wall during the time which intervened between February, 1932, and September, 1933, but on the other hand it permitted the lights to burn on the sign all during that time, which is bound to have been a considerable expense. It is true this was said to have been an oversight. But as we have stated before, that position is entirely inconsistent with the position taken by defendant in its letter of September 14, 1933.

"We think the matter hinges upon the real, underlying reason why Mr. Jones refused his consent to the servicing of the sign, and that for the erection of the new board obscuring the old board.

"The testimony on this score is furnished entirely by Mr. Jones, a witness for plaintiff; Mr. Stern, a witness for plaintiff, and Mr. Anderson, a witness for defendant; Mr. Jones being the only disinterested witness of the three.

"After Mr. McFaddin received the request from plaintiff to repaint the sign, he sent Mr. Anderson to see Mr. Jones to ascertain his attitude as to servicing the sign, and out of this visit the whole trouble grew.

"Mr. Stern testified that Mr. Anderson told him that he had to use methods to get rid of that contract which he did not approve of, but that he had to do it. Mr. Anderson denied making any such statement.

"The testimony of Mr. Jones and that of Mr. Anderson is just as contrary as it is possible to be. Mr. Jones testified that Mr. Anderson approached him and suggested the erection of the boards which were later erected, and finally an agreement was reached for same whereby witness got one ad, and illumination for his parking lot for free use of the space used by the boards; that witness was willing to accommodate the B&B in any way he could; that Mr. Anderson told him that they had an existing contract with the Auto-Lec Stores which would prevent these boards being put up * * * as soon as the letter was given that would abrogate the contract. Under those conditions Mr. Anderson prepared the letter and Mr. Jones signed it.

"Mr. Jones further testified that he had never even considered such a matter as the boards until Mr. Anderson suggested same and that he had no objection to the B&B servicing the Auto-Lec sign, but that he did not know how long he would have continued in that frame of mind.

"Mr. Anderson denied in toto the testimony of both Mr. Stern and Mr. Jones. As to Mr. Jones, he testified that all suggestions came from Mr. Jones, and that Mr. Jones almost bullied him into entering into the contract which was a very expensive one to the B&B.

"Mr. Anderson is contradicted by both Mr. Stern and Mr. Jones, and Mr. Jones

is totally disinterested, and we hardly see how we can refuse to accept his testimony under the circumstances.

"We have no reason to doubt the good faith of Mr. McFaddin in sending Mr. Anderson to see Mr. Jones. It was the proper thing to do, and if Mr. Jones had, of his own free will and accord, refused to permit the B&B to go on the lot to service the sign, then there would have been a different situation. But when the defendant, through its Mr. Anderson, created a situation which brought the contract to an end, or rather made it worthless, then it must bear the consequences.

■ "There are two remaining questions, the amount of damage per month, and how long it is to continue. Mr. Stern testified: ·

" 'Q. Did you ever take up with the Auto-Lec Stores, Mr. Stern, how much it would cost to keep that sign up on that building? A. Yes.

" 'Q. How much? A. $35.00 per month.

" 'Q. Do you think it was worth $35.00 per month to have that sign up there? A. Yes. .* * *

" 'Q. Why do you say it was worth $35.00? A. Well, as an advertising medium to us. In fact it was all the advertising that we could really get on McNeil Street. * * *

" 'Q. I believe you have said that it would cost $35.00 per ·month for the sign that you had. Did the B&B System tell you that was their charge? A. Yes.'

"Mr. McFaddin on page 59:

" 'Q. If the sign had been kept up, painted every six months, which would it have been worth? A. We don't build them like that any more, back in 1928 on up\ to '32, we built signs on tops of walls for $15.00 a month up, and that was about a fifteen dollar a month job.' · ·. , ·

"The testimony of Mr. Anderson on this score is valueless for he was giving the prices on what B&B had to pay, and not what it charged its customers.

"If Mr. McFaddin had been definite in his testimony, it would have been worth more than that of Mr. Stern, for he has more knowledge on the subject, but in view of his indefiniteness, we think the fairer thing to do is to split the difference between the $15.00 and $35.00 and call it $25.00 per month from September 14, 1933, as damages.

■ "The next question is how long same is to continue. The prayer of the petition is:

" '* * * per month beginning September 14, 1933, said sum to be due and owing petitioner each and every month from said date until such time as your petitioner shall no longer occupy the said premises now leased by it, together with 5% per annum interest on all of said sums from their due date until paid.'

"The lease contract which was in existence at the time the case was tried expired on August 31, 1934, but the lease contract also provided that the Auto-Lec should have the option of renewing the lease for an additional period of two years by giving notice of the exercise of the option not less than 90 days prior to termination. The case was tried on June 12, 1934, and Mr. Stern testified (page 3) that it was their intention to continue on that property. That was long after the time had expired for the giving of the notice mentioned in the contract, and there is no testimony in regard to same. If the notice was not given, then the Auto-Lec would not have had the right to renew the lease, and any possible occupancy would necessarily be under a new contract of lease. We do not know whether plaintiff now has the building leased or not. Under the terms of the contract between plaintiff and defendant, the same was to last as long as 'you have the said building leased.' We do not mean to say that the contract between plaintiff and defendant expired on August 31, 1934, but up until that time the building was leased and we do not know what the situation has been since that time. We think the proper judgment would be for $25.00 per month, beginning September 14, 1933, and continuing until August 31, 1934, with legal interest as prayed for, and reserving to plaintiff the right to sue for damages accruing since August 31, 1934.

"T. F. Bell,
"District Judge."

We fully agree with the opinion of the lower court as to the liability of defendant, as well as the amount awarded as damages to plaintiff.

It therefore follows that the judgment of the lower court is affirmed, with costs.